IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

Plaintiff,

v.

EDUARDO CRUZ-RIVERA,

Defendant.

CRIMINAL NO. 06-027 (JAG)

## REPORT AND RECOMMENDATION

## INTRODUCTION

Defendant Eduardo Cruz-Rivera ("Cruz-Rivera") filed a Motion to Suppress claiming all the evidence seized from his Mazda 6 vehicle on January 17, 2006 was the product of an illegal search and seizure without probable cause. Cruz-Rivera avers the officers of the Puerto Rico Police Department ("PRPD") lied about the probable cause requirement in order to administratively search the vehicle at the Vega Baja Police Station by alleging there was a firearm at plain view inside the vehicle. (**Docket No. 23**).

The Government filed its Response in Opposition to Defendants' Motion for Suppression of Evidence claiming the initial stop of the vehicle was based on reasonable suspicion and defendant's subsequent arrest and search of the vehicle were lawful. Accordingly, the Government claims the evidence should not be suppressed. (**Docket No. 24**)

The Motion to Suppress was referred by the Court to the undersigned for hearing and report and recommendation. (**Docket Nos. 24 and 25**).

United States of America v. Eduardo Cruz-Rivera
Criminal No. 06-027 (JAG)
Report and Recommendation
Page 2

The evidentiary hearing was held on June 20, June 21 and July 14, 2006 wherein the testimonies of Puerto Rico Police Officers ("PRPOs") Orlando Guzmán-Vélez ("PRPO Guzmán"), Angel Carrer-Rivera ("PRPO Carrer"), José L. Ruiz-Pagán ("PRPO Ruiz") and defendant Cruz-Rivera, were presented.  (**Docket Nos. 33, 34 and 37**).

On June 21, 2006, a visual inspection of defendant's vehicle was conducted by the Court at the parking lot of the United States Marshal Service.  The Court inspected the vehicle in the presence of defendant, his attorneys and attorneys for the Government. (**Docket No. 34**).

Transcripts for the suppression hearing were requested and filed.  (**Docket Nos. 36, 38 and 39**).  On August 21, 2006, the certified translations of Government's Exhibits 1 and 2 were filed.[1] (**Docket No. 42**). Transcript of the visual inspection was requested and filed on September 6, 2006.[2] (**Docket No. 45**).

## FACTUAL BACKGROUND

## I.    Testimony of  Puerto Rico Police Officer Orlando Guzmán-Vélez.

PRPO Guzmán, Badge #27794, has worked for the PRPD for eight (8) years.  On January 17, 2006, PRPO Guzmán attended a matter in the state court in Bayamón and, upon leaving the court and in transit to the Vega Baja Drugs Division on Highway No. 22, he was

---

[1] The law incontrovertibly demands  federal litigation in Puerto Rico shall be conducted in English. 48 U.S.C.A. § 864. In collecting record the United States District Court for the District of  Puerto Rico must sift out non-English materials, and parties should submit only English language materials. 48 U.S.C.A. § 864. *See* González-De-Blasini v. Family Dept., 377 F.3d 81 (1st Cir. 2004);  Estades-Negroni v. Associates Corp. of North America, 359 F.3d 1 (1st Cir. 2004).

[2] Thus, the Motion to Suppress was deemed submitted on September 6, 2006.

United States of America v. Eduardo Cruz-Rivera
Criminal No. 06-027 (JAG)
Report and Recommendation
Page 3

driving behind a black Mazda 6 vehicle.  PRPO Guzmán was in a marked PRPD vehicle along with PRPO Carrer.  As soon as PRPO Guzmán was behind the Mazda 6 vehicle, he noticed the vehicle made an improper lane change by improperly cutting to the left in front of another vehicle.  As soon as the improper lane change was made, PRPO Guzmán followed the Mazda 6 vehicle and observed it was going at a high rate of speed.  PRPO Guzmán immediately called via radio communication the Vega Baja Drugs Division and informed PRPO Ruiz of the Mazda 6 vehicle and that he was going to stop said vehicle because it was going at a high rate of speed. PRPO Ruiz told PRPO Guzmán to keep following the vehicle which made several other improper lane changes.  The Mazda 6 vehicle exited at the Trio Vegabajeño Exit where PRPO Guzmán had already caught up with the vehicle.  As soon as the Mazda 6 vehicle exited at the Trio Vegabajeño exit, PRPO Guzmán stopped the vehicle aided by the siren and the lights of his patrol car.  PRPO Guzmán walked towards the driver of the Mazda 6 vehicle while PRPO Carrer approached the passenger's side.  PRPO Guzmán asked the driver, later identified as defendant Cruz-Rivera, to provide his driver's license and that of the vehicle because he had made some improper lane changes.  Cruz-Rivera told PRPO Guzmán he did not have his driver's license but he had the one for the vehicle.  PRPO Guzmán asked the driver to step out of the vehicle for the taking of his general data.  At that moment, PRPO Guzmán backed up, approximately to the trunk area of the Mazda 6 vehicle, Cruz-Rivera got out of the vehicle and, as soon as he got out, PRPO Carrer told PRPO Guzmán to put Cruz-Rivera under arrest because he had a weapon.  PRPO Carrer was on the right side of the vehicle at the passenger's

United States of America v. Eduardo Cruz-Rivera
Criminal No. 06-027 (JAG)
Report and Recommendation
Page 4

door.  As soon as PRPO Carrer told PRPO Guzmán to put Cruz-Rivera under arrest, PRPO

Guzmán grabbed Cruz-Rivera by his hand and asked him whether he had a license to possess

a weapon.   Cruz-Rivera remained silent.  Cruz-Rivera was handcuffed and he was read his

legal warnings.  As soon as Cruz-Rivera was placed under arrest, PRPO Guzmán saw PRPO

Carrer taking out a black weapon from inside the Mazda 6 vehicle.   Then, PRPO Ruiz and Sgt.

Negrón arrived to the scene and the PRPOs proceeded to the Drugs Division with Cruz-Rivera

and the Mazda 6 vehicle.

Once at the Drugs Division, PRPO Guzmán took Cruz-Rivera's general information

including his name and address.    Then, PRPO Guzmán issued two tickets for the traffic

violations, including improper lane changes and driving without a license. Then, PRPOs Carrer

and Ruiz took Cruz-Rivera downstairs to do an inventory search of the vehicle.  PRPO Guzmán

was not present when the vehicle's inventory search was done because he was upstairs at the

Drugs Division.

Exhibit 1 is a traffic ticket issued by PRPO Guzmán to Cruz-Rivera for driving without

a license.

Exhibit 2 is a traffic ticket issued by PRPO Guzmán to Cruz-Rivera for improper lane

changes.[3]

---

[3] Pursuant to Exhibits 1and 2, the traffic violations were committed by defendant at 4:45 PM.  Exhibits
1 and 2 (traffic tickets) have five parts to them and the pink page is the one he gave to Cruz-Rivera.  These two
traffic tickets were written by PRPO Guzmán about one and a half hours after Cruz-Rivera's arrest.

United States of America v. Eduardo Cruz-Rivera
Criminal No. 06-027 (JAG)
Report and Recommendation
Page 5

Exhibit 3 is a black Smith & Wesson pistol PRPO Guzmán saw inside Cruz-Rivera's Mazda 6 vehicle and which was seized.

Exhibit A-1 is the Spanish version of the transcript of the Rule 6 hearing in state court.

Exhibit A-2 is the English translation of the transcript of the Rule 6 hearing in state court.

On cross examination, PRPO Guzmán stated he was the driver of the marked patrol vehicle which was a Ford Explorer. The first time PRPO Guzmán observed the black Mazda 6 vehicle it was already going through the Vega Alta/ Vega Baja toll booth. The Mazda 6 vehicle was five (5) or six (6) cars in front of the patrol car. PRPO Guzmán did not have a traffic ticket book assigned to him but there was one in the patrol car. PRPO Guzmán saw the Mazda 6 vehicle committing an illegal or improper lane change which was defined by him as, without taking the necessary precautions and signals, suddenly moving in front of another vehicle. After the Mazda 6 vehicle made the improper lane change, it accelerated its speed to an excessive speed. PRPO Guzmán followed the vehicle for about two (2) minutes after the improper lane change was made and until PRPO Guzmán was able to catch up with the Mazda 6 vehicle at the exit of Trio Vegabajeño. As soon as PRPO Guzmán caught up with the Mazda 6 vehicle and got behind it, PRPO Guzmán turned on the siren of the patrol car to stop the Mazda 6 vehicle. Once the Mazda 6 vehicle made a stop, PRPO Guzmán asked the driver for his driver's license and car registration and then asked the driver to step out of the vehicle. The driver (Cruz-Rivera) got out of the vehicle and closed the door; he did not lock the door.

The first time PRPO Guzmán saw the weapon which was discovered inside the Mazda 6 vehicle was when PRPO Carrer took it out of the vehicle and showed it to PRPO Guzmán. When PRPO Guzmán approached the Mazda 6 vehicle, the windows were up. Then, the window of the driver's side was lowered for defendant Cruz-Rivera to talk to PRPO Guzmán. At this time, PRPO Guzmán did not see anything unusual. PRPO Guzmán did not see Cruz-Rivera trying to hide a gun in between nor underneath the seats of the vehicle. Cruz-Rivera stepped out of the vehicle and closed the door. PRPO Guzmán does not remember whether Cruz-Rivera rolled the window back up or not.

In an effort to impeach PRPO Guzmán, defense counsel confronted him with the transcript of the Rule 6 hearing at state court, and he testified that Cruz-Rivera in fact rolled back up his window and closed the door.

PRPO Guzmán testified he has made no sworn statements related to this matter. PRPO Guzmán observed Cruz-Rivera make approximately three (3) improper lane changes. PRPO Guzmán called on several occasions PRPO Ruiz before and after stopping the Mazda 6 vehicle.

On the night of January 17, 2006, Cruz-Rivera was taken to the Bayamón Courthouse for the submission of criminal charges. PRPO Guzmán indicated that, back in January 2006, he gave traffic tickets "but not that frequently."

PRPO Guzmán did not participate in filling out the PPR-128 while the inventory search of the Mazda 6 vehicle was conducted.

## II.    Testimony of  Puerto Rico Police Officer Angel David Carrer.

PRPO Carrer has been employed with the PRPD for eight (8) years.  On January 17, 2006, PRPO Carrer was along with fellow PRPO Guzmán coming from the Bayamón courthouse to the Vega Baja Drugs Division to conclude the day.  They were traveling on a marked patrol car on Route 22.  PRPO Carrer was on the passenger side of the patrol car and PRPO Guzmán was the driver.  The first time PRPO Carrer saw the black Mazda 6 vehicle they were moving in direction to Vega Baja and they had passed the Vega Baja toll.  The Mazda 6 vehicle was going at excess speed and it made improper lane changes, reason why the PRPOs followed the vehicle.  The PRPOs intervened with said vehicle at the exit of the Trio Vegabajeño Avenue.

When the Mazda 6 vehicle was stopped, PRPO Guzmán approached the driver's side of the vehicle and PRPO Carrer gave him backup on the passenger's side.  PRPO Carrer heard PRPO Guzmán asking the driver to give him the registration papers, while PRPO Carrer moved towards the passenger's window on the front part.  Said window was half way and, when PRPO Carrer approached the passenger side of the Mazda 6 vehicle, he observed a pistol placed between the middle console and the front passenger seat.  PRPO Carrer could only see the handles of the pistol but recognized it as a SW-99.  PRPO Carrer recognized the pistol as a SW-99 because he was assigned at the PRPD a pistol just like that one.  The pistol was then seized from inside the Mazda 6 vehicle (Exhibit 3).  Then, PRPO Carrer told PRPO Guzmán to arrest Cruz-Rivera because he had a weapon.  PRPO Carrer recalls that PRPO Guzmán asked Cruz-

Rivera on several occasions if he had a license to carry or possess a weapon and Cruz-Rivera did not answer.  Cruz-Rivera was placed under arrest.

After Cruz-Rivera was arrested, Sgt. Negrón came to the scene along with PRPO Ruiz and Cruz-Rivera was transferred to the Vega Baja Drugs Division.  At the Vega Baja Drugs Division, PRPO Guzmán issued two traffic tickets and afterwards, PRPO Carrer went downstairs to conduct the inventory search of the Mazda 6 vehicle.  The Mazda 6 vehicle was inspected in the presence of its owner, defendant Cruz-Rivera.  PRPO Carrer conducted the inspection of the vehicle along with PRPO Ruiz and they used a PPR-128, which is the form used by the PRPD to conduct an inventory of an impounded vehicle.  The PPR-128 form used in this case was marked as Exhibit 4.

The PPR-128 in this case was prepared because a weapon was seized from the Mazda 6 vehicle, the vehicle was seized for investigation and an inventory had to be done so the owner could observe the content of the vehicle and if he/she agreed, the owner signed the PPR-128. In this case, Cruz-Rivera did sign the PPR-128 but he made no statements during the inventory of the vehicle.  While the PRPOs were finishing the inventory of the vehicle pursuant to the PPR-128, they were able to observe that, in the seat in the back part of the Mazda 6 vehicle, there was something which was not normal.  There were some door hinges and the back seat was hard and rigid.  The back seat would not move up or down; it was stuck there.

PRPOs Carrer and Ruiz took a course at the DEA regarding hidden compartments. When they became aware of the hidden compartment, they looked for a way to open the same.

United States of America v. Eduardo Cruz-Rivera
Criminal No. 06-027 (JAG)
Report and Recommendation
Page 9

Exhibit 5 is a close-up photograph of the compartment opened and Exhibit 6 is a photograph

of the back seat with the compartment opened; the seat is pulled up.  When one looks under

the back seat, it is altered to create space.  The rug looked fine.   A long weapon, an AK-47

(Exhibit 7) with loaded magazines, was found underneath the seat inside the compartment.

Exhibit 8 is a loaded magazine which was seized from the vehicle underneath the seat

inside the compartment.

Exhibit 9 are the bullets which were in the loader or magazine.

Exhibit 10 are some 9mm bullets which were in the 9mm magazine.

Exhibit 11 are the bullets which were in the pistol and the other magazine which was

seized under the seat inside the compartment.

Exhibit 12 are two magazines; one was in the pistol and the other one was under the seat

inside the compartment.

Exhibit 13 is a photograph which was taken at the Vega Baja Drugs Division of the

evidence which was seized in the vehicle, including 920 capsules of crack; the AK-47, the

ammunition for the AK-47; the SW-99 pistol with two magazines; a 9mm magazine with

ammunition; an AK-47 magazine; three cellular telephones; and a set of keys.  The 920 capsules

of crack were in a transparent bag with a pressure seal inside a brown paper bag which was

found under the back seat in the compartment.

Exhibit 3 (SW-99 pistol) was loaded and had ammunition when PRPO Carrer found it

and seized the same.  PRPO Carrer approached the vehicle because he observed that Cruz-

Case 3:06-cr-00027-JAG   Document 47   Filed 09/13/06   Page 10 of 40


United States of America v. Eduardo Cruz-Rivera
Criminal No. 06-027 (JAG)
Report and Recommendation
Page 10

Rivera made a movement and for precautionary measures.  PRPO Carrer looked into Cruz-Rivera's hand but they were empty.  Nonetheless, PRPO Carrer was able to observe the pistol's grips in the middle console which he recognized because he had a similar pistol assigned at the PRPD.

On cross-examination, PRPO Carrer indicated he testified at the Rule 6 hearing in state court but he did not testify before a federal Grand Jury.  PRPO Carrer testified he informed federal agent Charles Ellison he saw Cruz-Rivera make a movement that, to PRPO Carrer's understanding, was an attempt to hide something under the seat.

PRPO Carrer was confronted with the Rule 6 transcript (Exhibit A-2), in a effort to impeach him, as to the fact that at the Rule 6 hearing PRPO Carrer indicated he first saw the black Mazda 6 near the toll booth of Dorado.  PRPO Carrer clarified at the suppression hearing before the undersigned he has always referred to the same toll booth and what you really see is the Vega Alta toll.  PRPO Carrer clarified that on direct he made reference to the Vega Alta toll.  During the Rule 6 hearing, PRPO Carrer did not mention the Mazda 6 vehicle was speeding even though he mentioned the vehicle was speeding at the suppression hearing.  PRPO Carrer clarified the vehicle was zigzagging and it was at a high rate of speed.  PRPO Guzmán was the first person to see the vehicle zigzagging and he alerted PRPO Carrer who then looked at the vehicle and saw it zigzagging close to the toll in the direction towards the "Puente del Indio."  They followed the Mazda 6 vehicle for about three (3) to five (5) minutes.  The Mazda 6 vehicle was stopped at the Trio Vegabajeño Exit.  Once the vehicle was stopped,

United States of America v. Eduardo Cruz-Rivera
Criminal No. 06-027 (JAG)
Report and Recommendation
Page 11

PRPO Carrer went to the passenger's side of the vehicle as he was taught in the police academy to give protection to his partner, PRPO Guzmán.  PRPO Carrer walked from the back to the right side of the Mazda 6 vehicle and stood in the post which divides the front door and the back door of the Mazda 6 vehicle.  PRPO Carrer was less than a foot from the Mazda 6 vehicle and he could observe PRPO Guzmán who was standing besides the post on the driver's side of the Mazda 6 vehicle.   PRPO Carrer could see, from where he was standing, Cruz-Rivera seating inside the car.  PRPO Guzmán asked Cruz-Rivera for the legal documents and Cruz-Rivera opened the door, stepped out and closed the door.  PRPO Carrer did not hear PRPO Guzmán asking Cruz-Rivera to step out of the car. PRPO Carrer saw the grips of the pistol through the vehicle's window which was midway opened.  PRPO Carrer entered the vehicle through the passenger's side to seize the pistol.

As to Exhibit 4, PRPO Carrer stated that it was a mistake that, the information as to why the vehicle was seized, was not completed.  Cruz-Rivera signed the PPR-128 but refused to receive a copy of the PPR-128.

PRPO Carrer stated there is no policy at the PRPD for agents to follow if they encounter a compartment like the one in this case.  Nonetheless, PRPO Carrer received training at the DEA but only related to how to open a compartment.

PRPO Carrer was present when the compartment of the Mazda 6 vehicle was opened by PRPO Ruiz. PRPO Ruiz opened the compartment aided by an electronic device and he used some wires to open it.  An electronic mechanism similar to the one used in this case is not

United States of America v. Eduardo Cruz-Rivera
Criminal No. 06-027 (JAG)
Report and Recommendation
Page 12

regularly used while performing an inventory of a vehicle.  The time was not written down on Exhibit 4 (PPR-128).

On re-direct examination, PRPO Carrer testified that the PPR-128 is the form used by the PRPD to conduct an inventory search of a vehicle.  The PPR-128 includes everything.  The PRPO verifies whether the vehicle has the accessories which the PPR-128 indicates and if the body is in good condition.  The trunk is normally opened and verified.  The whole vehicle is verified, the carpets are pulled and everything is checked.  The PRPOs look underneath and behind the seats and that is how the compartment in this case was found.  Within PRPO Carrer's experience of eight years with the PRPD he has found about three compartments but only the one in this case in the back seat.  After the compartment of the Mazda 6 vehicle was found, an inventory was made of all the content of the compartment.  The inventory search in this case was done in the typical way inventory searches are done by the PRPD.

On re-cross examination, PRPO Carrer testified the compartment found in the Mazda 6 vehicle in this case is not common.  Nowhere in the PPR-128 does is ask the agent to move the back seat of the car to see if it is affixed.

**III.    Testimony of  Puerto Rico Police Officer José Ruiz Pagán.**

PRPO Ruiz has been employed with the PRPD for almost fifteen (15) years.  On January 17, 2006, PRPO Guzmán made a radio call to the Drugs Division indicating that he was going to make a stop of a black vehicle which was being followed in Route 22 getting to Vega Baja. PRPO Ruiz went to the scene and he found that PRPOs Guzmán and Carrer had arrested Cruz-

United States of America v. Eduardo Cruz-Rivera
Criminal No. 06-027 (JAG)
Report and Recommendation
Page 13

Rivera and they had seized a firearm.  PRPO Ruiz identified Exhibit 3 as the pistol which was
seized from inside the Mazda 6 vehicle.  After Cruz-Rivera was arrested, they went to the Vega
Baja Drugs Division where PRPO Guzmán issued some traffic tickets.  Afterwards, PRPOs
Carrer and Ruiz, in the presence of Cruz-Rivera, performed the inventory search of the vehicle.
Something was found during the inventory search which was out of the ordinary, namely, the
back seat, the lower part of the seat was very hard and between the back of the seat and the
seat there were some hinges.  PRPO Ruiz tried to determine what was happening because that
situation is not common in this kind of vehicle. PRPO Ruiz found it to be a hidden
compartment.  The PRPOs always look under the seats to find anything which may be there so
it will not be alleged afterwards that an item is missing and they would be held responsible.   It
is generally the PRPD's policy to verify these types of compartments.   These types of
compartments are opened on normal occasions. During this inventory search, PRPO Ruiz
checked under the front seats, in the trunk and once the hidden compartment was found, it was
also checked.   Inside the hidden compartment the following items were found: an AK-47 rifle,
some pistol magazines and an AK-47 magazine loaded and a paper bag full of 920 capsules
with black caps which had a white substance which was apparent cocaine.    PRPO Ruiz
recognized Exhibit 13 as the evidence which was seized from said compartment. None of the
other inventory searches performed by PRPO Ruiz had hidden compartments like this one.

On cross-examination, PRPO Ruiz indicated that on several occasions he has assisted
in a Drugs Division traffic stop.  PRPO Ruiz wrote the top portion of PPR-128 (Exhibit 4); the

United States of America v. Eduardo Cruz-Rivera
Criminal No. 06-027 (JAG)
Report and Recommendation
Page 14

rest of the document was written by PRPO Carrer.  PRPO Ruiz did not date the PPR-128 nor

did he put a time on the same.  On the part PRPO Ruiz filled out of the PPR-128, he did not

put the tag number or "marbete" of the vehicle.  The reason why the vehicle was in possession

of the PRPD was not marked either in the top portion of Exhibit 4 which was filled out by PRPO

Ruiz.  No information was written down under the "commentaries" section of the PPR-128 nor

in the "notice to the owner" section.  The PPR-128 (Exhibit 4) has a date on page two.

PRPO Ruiz admitted this is the first time he has dealt with a hidden compartment like

the one in this case.  PRPO Ruiz received training at the DEA and at the PRPD on how to

search for and look for evidence in hidden compartments in a car.  PRPO Ruiz understands a

glove compartment or a trunk are hidden compartments because you cannot see what is inside.

PRPO Ruiz admitted that at the Rule 6 hearing he testified he had to raise the edge of

the back seat in order to see the hinges because the seat was not normal and was not flexible.

After PRPO Ruiz noticed the back seat was not normal and was not flexible, he lifted the edge

of the back part of the back seat.

The drugs were handed to PRPO Ruiz at 5:00 PM, after the PPR-128 had been filled out

and the traffic tickets had been given to Cruz-Rivera.

In order to open the hidden compartment, PRPO Ruiz had to locate some cables,

connect electricity and then it opened.  After noticing the back seat was not normal, PRPO Ruiz

located the wires which were not part of the original wiring of the Mazda 6 vehicle.  The wires

were on the left side in the area of the bottom support inside a molding which is between the

United States of America v. Eduardo Cruz-Rivera
Criminal No. 06-027 (JAG)
Report and Recommendation
Page 15

carpet and the door.  The molding had to be lifted by PRPO Ruiz to find the wires.  PRPO Ruiz

connected electricity to the wires from a battery.  PRPO Ruiz had a tester light which operated

with positive and negative current which he connected to the wires.  PRPO Ruiz indicated the

use of this electronic machine is not standard operating procedure in performing an inventory

search.  In the prior fifty (50) inventory searches performed by PRPO Ruiz, he has used this

machine when he has needed it.  An inventory search is done answering the questions on the

PPR-128.

PRPO Ruiz took out the molding, identified the cables he was going to use, opened the

hood and connected them to the battery.  On this occasion, this was the usual police procedure

during the PPR-128.  It took PRPO Ruiz approximately one (1) to two (2) minutes to identify

the cables, cut the molding, set up the machine, open the hood, connect the mechanism and

open the compartment.

PRPO Edwin Martínez was there with PRPOs Carrer and Ruiz while performing the PPR-

128.

## IV.    Testimony of defendant Eduardo Cruz-Rivera.

Cruz-Rivera testified that on January 17, 2006 he was getting ready to go to Vega Baja

and he got on the José de Diego Highway using the Dorado toll entrance.  As soon as he got

on the expressway,  he used the cruise control and saw a patrol vehicle some cars behind his

car.   Cruz-Rivera did not want to be stopped by the police because he was on probation and

he knew he had something illegal underneath the back seat in a hidden compartment.  The

illegal items that Cruz-Rivera had were a pistol, a rifle and some drugs.  The hidden compartment worked with some secret codes in which Cruz-Rivera had to place a magnet in the ashtray, then press a button in the center console and dick the emergency break.  Then, Cruz-Rivera had to push the power window control and then the hidden compartment would open.  Cruz-Rivera could control whether the compartment opened upward or downward. What would open is the back seat and the system would work while the vehicle was running.

After Cruz-Rivera became aware that a patrol vehicle was a few cars behind, he continued driving in the highway to Vega Baja for about ten to fifteen minutes after passing the Vega Baja toll and then arrived at Exit 38 and exited there.  Cruz-Rivera stopped his vehicle and looked through the rear view mirror and saw that the patrol car also exited the highway. Cruz-Rivera stopped behind a truck and five people came from behind the truck with pistols in their hands and approached his car pointing at him.  Then, PRPO Guzmán exited his patrol car and came towards Cruz-Rivera's car.  PRPO Guzmán asked for Cruz-Rivera's drivers license and for the vehicle's registration.  PRPO Guzmán explained he was stopped for a traffic violation, namely, going over the speed limit.   Cruz-Rivera told PRPO Guzmán he was not going over the speed limit because he had the cruise control on.  Cruz-Rivera gave him the vehicle's registration but told PRPO Guzmán he did not have his driver's license at that moment because it was lost and he was trying to get a new one.  Cruz-Rivera also gave him the voter's registration card.  PRPO Guzmán asked him to get off the car to verify his information.  Cruz-Rivera stepped out of the car, closed the car, took out from his pockets two cellular phones and

United States of America v. Eduardo Cruz-Rivera
Criminal No. 06-027 (JAG)
Report and Recommendation
Page 17

the car keys which he put on top of the hood of the car.  PRPO Guzmán told him he could not

talk to anyone, and he took the car keys and cellular phones.  At that time, the five persons

(including PRPOs Guzmán and Carrer) started looking into the car for about twenty five

minutes in the middle of the street at Exit 38.  The PRPOs did not find anything.  Then, PRPO

Ruiz stated Cruz-Rivera had to be taken to the police headquarters to continue the search of the

car.  Cruz-Rivera asked if they had a search warrant to search his car and no one answered.

Cruz-Rivera was taken to the Vega Baja Drugs Division inside his own car which was

driven by PRPO Guzmán.  When they arrived at the police station, the officers continued

searching the car in his presence for about 30 to 45 minutes.  Cruz-Rivera was not allowed to

call his lawyer but he managed to place a call to attorney Lemuel Velilla Reyes from a third

cellular phone he had in his pocket.  Cruz-Rivera felt he could not leave the police station if he

wished to do so but he was never officially arrested nor handcuffed.  PRPO Guzmán wrote

some traffic tickets and one hour and 45 minutes passed when Cruz-Rivera heard a commotion

and people yelling.  At that moment, the officers came up with the pistol, the rifle and the bag

of drugs.  At that time, Cruz-Rivera was placed under arrest and Cruz-Rivera heard PRPO Ruiz

say they "had gotten a good tip."

On cross-examination, Cruz-Rivera testified he has had the black Mazda 6 vehicle for

about three to five months.  This car has had the hidden compartment for about one month and

a half to two months before the arrest.  The hidden compartment was designed to foul anyone

who would look into the car and would not see anything at plain view.  Cruz-Rivera testified he

did not want to be detained because he was on probation.  Cruz-Rivera did not inform any of the PRPOs that he was on probation.  Cruz-Rivera did not know any of the officers who intervened with him that day.  Around 15-20 minutes passed from the point Cruz-Rivera first saw the patrol car in his rear view mirror to the point in time when he was stopped by the police.  Cruz-Rivera never saw the five officers who stepped from behind the truck getting there. Cruz-Rivera had the drugs and the guns in the secret compartment since a day before.

To open the hidden compartment, the magnet was already in place in the lighter hole of the ashtray.  The button which had to be pressed on the center console was always on. Then, Cruz-Rivera had to click the emergency brake with the car moving and then push the window button, as if you were putting up or down the window, and the hidden compartment would open.  Cruz-Rivera could open the hidden compartment while the car was moving because all the combinations were active and he just had to put the window up.  When Cruz-Rivera exited the car at the time  his car was stopped, Cruz-Rivera disconnected the whole system once he saw the police and while he was driving.  The whole system was locked and there was nothing inside the car which could be seen at plain view.  Cruz-Rivera testified that he did not give any statements to the PRPOs.

Cruz-Rivera admitted he is aware his testimony is different to the testimonies of PRPOs Guzmán and Carrer as to the gun which they indicated was found between the console and the front passenger seat.

PRPO Guzmán asked Cruz-Rivera to take out everything from his pockets but he forgot to take out a third cellular phone because it was too small.  Nonetheless, Cruz-Rivera did not forget said cellular phone when he called attorney Velilla.   Cruz-Rivera testified that, when he exited his vehicle, he closed the car but there was nothing illegal between the console and the passenger seat.

Cruz-Rivera admitted he has a prior federal conviction for narcotics for which he was sentenced to 46 months of imprisonment in Criminal Case 00-35 before Hon. Judge José Fusté.  The offense for which he was convicted was for crack cocaine.

## LEGAL DISCUSSION

After evaluating the testimonies of PRPOs Guzmán-Pérez, Carrer and Ruiz[4] and that of defendant Cruz-Rivera, including their responsiveness and their demeanor on the stand, the documentary evidence presented at the evidentiary hearing, and having had the benefit of conducting a visual inspection of the Mazda 6 vehicle, this Magistrate Judge finds, pursuant to the preponderance of the evidence and considering the totality of the circumstances, the account of the PRPOs to be credible and accords little weight to defendant Cruz-Rivera's testimony under these circumstances.[5]

---

[4] Defense counsel made several efforts to impeach the credibility of the PRPOs by different means including the use of the transcript of the Rule 6 hearing in state court.  Even though there may have been some inconsistencies between the testimonies of PRPOs Guzmán, Carrer and Ruiz at the suppression hearing and their prior testimonies at the Rule 6 hearing, these inconsistencies do not affect the totality of the circumstances at the time, under which the PRPOs relied upon and for which there was reasonable suspicion for the investigatory stop of the vehicle and probable cause for the arrest and the inventory search of the vehicle, as explained herein below.

[5] The findings of the court after a hearing on a pretrial motion to suppress are binding unless they are clearly erroneous. United States v. de Jesús-Ríos, 990 F.2d 672, 677 (1st Cir.1993). United States v. Hernández-Rodríguez, 443 F.3d 138 (1st Cir. 2006) (credibility determinations in a report and recommendation should not be rejected by the Court without hearing the evidence examined by the Magistrate Judge).

United States of America v. Eduardo Cruz-Rivera
Criminal No. 06-027 (JAG)
Report and Recommendation
Page 20

## I.      Transfer of Jurisdiction to the Federal Authorities and Selective Prosecution.

Cruz-Rivera first claims in his Motion to Suppress the transfer of jurisdiction to the federal authorities was a subterfuge for subverting state law and a selective and vindictive prosecution by the federal authorities.  To this effect, the argument is mainly grounded in United States v. Aiudi, 835 F.2d 943 (1st Cir. 1987).

In Aiudi, the Court of Appeals for the First Circuit held that a search conducted by state police officers pursuant to an *invalid warrant* did not necessitate suppression of the evidence in federal court because a federal agent, who was at the scene at the time of the search, had authority to enter the premises without a warrant to do "legally ... exactly what ... the (state) police did unlawfully." United States v. Aiudi, 835 F.2d at 946.  *See* United States v. Pratt, 913 F.2d 982, 986 (1st Cir. 1990).  Defendant submits it is impossible for the Aiudi exception to apply to his case since federal agents had no previous knowledge of the operative conducted by state authorities and therefore could not be authorized to validate the illegal acts of the state police.

First and foremost, the state warrant in Aiudi was considered to be invalid or defective. Such is not the situation in the instant case since in this case there was no search warrant. Secondly, even if there were a state warrant and it was found in violation of state law, suppression is not warranted since admissibility of evidence in a federal prosecution is governed by federal law.  Admissibility of evidence obtained during a joint federal-state investigation for use in a federal criminal trial is governed by federal law. *Cf*. United States v. Jarabek, 726 F.2d

United States of America v. Eduardo Cruz-Rivera
Criminal No. 06-027 (JAG)
Report and Recommendation
Page 21

889, 900 (1st Cir. 1984) (federal courts must be careful not to sanction intentional unlawful conduct by law enforcement officers); *see also* United States v. Pratt, 913 F.2d 982, 987 (1st Cir. 1990).[6]

In addition, we note no evidence whatsoever was presented by the defense at the suppression hearing to support the assertion of alleged intentional unlawful conduct of the law enforcement officers and of alleged selective and vindictive prosecution.

Accordingly, defendant's claims that the transfer of jurisdiction to the federal authorities was a subterfuge for subverting state law and a selective and vindictive prosecution by the federal authorities and his arguments under Aiudi have no merit.

## II.     Investigatory Stop/Reasonable Suspicion.

Defendant Cruz-Rivera claims the stop of the Mazda 6 vehicle was unconstitutional because the PRPOs did not have probable cause to believe that a traffic violation had occurred.

An investigative stop, also known as a Terry stop, see Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868 (1968), occurs when a police officer, acting on reasonable and articulable suspicion of criminal activity, briefly detains an individual to confirm or dispel his suspicion." *Id.* at 6, 88 S.Ct. 1868 (citing United States v. McCarthy, 77 F.3d 522, 529 (1st Cir. 1996)).

---

[6] *But see* United States v. Sutherland  929 F.2d at 770 ("the language in note 10 of Jarabek implies only that in an extreme case of flagrant abuse of the law by state officials, where federal officials seek to capitalize on that abuse, this court might choose to exercise its supervisory powers by excluding ill-gotten evidence. This pronouncement is not ground-breaking; it merely traces the contours of a well-established power inherent in the federal courts. *See* Elkins v. United States, 364 U.S. 206, 216, 80 S.Ct. 1437, 1443-44 (1960). (It certainly does not delineate an exception to the general rule that federal law governs in federal prosecutions").

With regards to investigative stops, the Court must determine "not whether the police had probable cause to act, but instead whether the actions taken were reasonable under the circumstances." *Id.* The Court must first conclude whether the officer's action was justified at its inception. If the action is justified, the Court must then ask whether the action taken was reasonably related in scope to the circumstances which justified the interference. *Id.* To satisfy the first prong, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." United States v. Young, 105 F.3d 1, 7 (1st Cir. 1997)  (citing United States v. Kimball, 25 F.3d 1, 6 (1st Cir. 1994)). To fulfill the second prong, the Court must examine the totality of the circumstances. *See* United States v. Walker, 924 F.2d 1, 4 (1st Cir. 1991); *see also* United States Acosta-Colón, 157 F.3d 9, 14 (1st Cir. 1998).

Based on the abovementioned case law, we conclude the PRPOs had reasonable suspicion to conduct an investigatory stop of Cruz-Rivera's Mazda 6 vehicle.  Accordingly, the investigatory stop was legal.  We explain.

PRPOs Guzmán and Carrer, with eight years of experience each as a police officers, in sum testified that on January 17, 2006, while in transit to the Vega Baja Drugs Division on Highway No. 22 in a marked patrol vehicle, they were driving behind a black Mazda 6 vehicle. As soon as PRPOs Guzmán and Carrer were behind the Mazda 6, they noticed the vehicle made an improper lane change.  As soon as the improper lane change was made, PRPOs Guzmán and Carrer decided to follow the vehicle and noted it was going at a high rate of

United States of America v. Eduardo Cruz-Rivera
Criminal No. 06-027 (JAG)
Report and Recommendation
Page 23

speed.   After the vehicle was being followed, it made other improper lane changes.  When the vehicle was eventually stopped, PRPO Guzmán asked the driver, later identified as defendant Cruz-Rivera, to provide his driver's license and that of the vehicle because he had made some improper lane changes.  Cruz-Rivera told PRPO Guzmán he did not have his driver's license but he had one for the vehicle.  Thus, defendant was given two traffic tickets for driving without a license and for improper lane change.  (See Exhibits 1 and 2).

The testimonies of PRPOs Guzmán and Carrer were disputed in part by the testimony of defendant Cruz-Rivera who testified he was not speeding because he had the cruise control on.  Nonetheless, defendant Cruz-Rivera failed to dispute the improper lane changes observed by the PRPOs because he did not deny in his testimony he made the improper lane changes. Moreover, defendant Cruz-Rivera admitted during his testimony that, even though he gave PRPO Guzmán the vehicle's registration, he told PRPO Guzmán he did not have his driver's license at that moment because it had been lost and he was trying to get a new one.  Thus, defendant Cruz-Rivera corroborated the testimony of both PRPOs Guzmán and Carrer that he was driving without a license, had performed improper lane changes and, thus, committed several traffic violations.

Thus, there was reasonable suspicion for the stop of the Mazda 6 vehicle.  As such, the traffic tickets for improper lane change and driving without a license (Exhibit 1 and 2) were properly issued.[7]

---

[7] No traffic ticket was given to defendant Cruz-Rivera for speeding.

United States of America v. Eduardo Cruz-Rivera
Criminal No. 06-027 (JAG)
Report and Recommendation
Page 24

Defense counsel tried to impeach the credibility of PRPOs Guzmán and Carrer because they are assigned to the Drugs Division and not the Traffic Division. Accordingly, defense counsel tried to establish that being both from the Drugs Division they normally do not make traffic stops. Nonetheless, PROP Guzmán testified he did not have a traffic ticket book assigned to him but there was one in the patrol car. Moreover, PRPO Guzmán testified that, back in January 2006, he did give traffic tickets "but not that frequently." Therefore, even though PRPOs Carrer and Guzmán are from the Drugs Division, they have conducted traffic stops in the past and there was a traffic booklet in the patrol car available for that purpose.

In view of the foregoing, it is undisputed defendant Cruz-Rivera made some traffic violations, including improper lane changes which were observed by the PRPOs and he was driving without a license. Accordingly, given the totality of the circumstances surrounding the initial investigatory stop of defendant as above summarized, we conclude the PRPOs had sufficient reasonable suspicion to make the initial stop of the Mazda 6 vehicle defendant Cruz-Rivera was driving.

**III**. **Warrantless Arrest Was Lawful.**

A warrantless arrest is constitutionally valid if, at moment arrest is made, officers have probable cause to make it, that is, if at that moment facts and circumstances within their knowledge and of which they had reasonably trustworthy information are sufficient to warrant a prudent man in believing that the arrestee had committed or was committing an offense. United States v. Ayres, 725 F.2d 806 (1st Cir. 1984); United States v. Young, 105 F.3d 1, 6 (1st

Cir. 1997) (same).  Whether there is probable cause for a warrantless arrest is determined under an objective standard, not by inquiry into officers' presumed motives.  *Id.*

Probable cause "is a practical, nontechnical conception" offering an acceptable compromise between competing societal interests in protecting citizens on the one hand from abusive interferences with privacy and unfounded charges of crime and on the other hand in recognizing the necessity to afford 'fair leeway for enforcing the law in the community's protection.'" Brinegar v. United States, 338  U.S. 160, 176, 69 S.Ct. 1302, 1311 (1949).

A warrantless arrest requires probable cause, the existence of which must be determined in light of the information that law enforcement officials possessed at the time of the arrest. *See* United States v. Diallo, 29 F.3d 23, 25 (1st Cir. 1994).  To establish probable cause, the government "need not present the quantum of proof necessary to convict." United States v. Uricoechea-Casallas, 946 F.2d 162, 165 (1st Cir.1991); United States v. Meade, 110 F.3d 190, 193 (1st Cir. 1997).

The inquiry into probable cause focuses on what the officer knew at the time of the arrest, United States v. Brown, 169 F.3d 89, 91 (1st Cir. 1999), and should evaluate the totality of the circumstances. United States v. Reyes, 225 F.3d 71, 75 (1st Cir. 2000). "[P]robable cause is a common sense, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Meade, 110 F.3d at 198 n. 11; United States v. Vongkaysone, 434 F.3d 68, 73 (1st Cir. 2006).

Applying the above case law to this case, we conclude defendant Cruz-Rivera's arrest after the investigatory stop was lawful and based on probable cause.  Pursuant to the testimony of PRPO Guzmán, while conducting the investigatory stop and before placing defendant Cruz-Rivera under arrest, PRPO Guzmán asked defendant to get off the vehicle to take his data. Defendant Cruz-Rivera got out of the vehicle and, as soon as he got out of the Mazda 6 vehicle, PRPO Carrer told PRPO Guzmán to put Cruz-Rivera under arrest because he had a weapon. As soon as PRPO Carrer told PRPO Guzmán to put Cruz-Rivera under arrest, PRPO Guzmán asked Cruz-Rivera whether he had a license to possess a weapon.  Cruz-Rivera remained silent. Cruz-Rivera was handcuffed, read his legal warnings and placed under arrest.  As soon as Cruz-Rivera was arrested, PRPO Guzmán saw PRPO Carrer taking out from inside the Mazda 6 vehicle a black weapon.

The testimony of PRPO Carrer to this effect is consistent with that of PRPO Guzmán. PRPO Carrer testified that, when the car was stopped, PRPO Guzmán approached the driver's side of the vehicle and PRPO Carrer gave him backup on the passenger's side.  PRPO Carrer heard PRPO Guzmán asking the driver (Cruz-Rivera) to give him the registration papers, while PRPO Carrer moved towards the passenger's window on the front part.  Said window was half way and when PRPO Carrer approached that side he observed a pistol placed between the middle console and the front passenger seat.  PRPO Carrer could only see the handles of the pistol but recognized it as a SW-99 because he had been assigned at the PRPD a pistol just like it.  Then, PRPO Carrer told PRPO Guzmán to arrest Cruz-Rivera because he had a weapon.

United States of America v. Eduardo Cruz-Rivera
Criminal No. 06-027 (JAG)
Report and Recommendation
Page 27

PRPO Carrer recalls  PRPO Guzmán asked Cruz-Rivera on several occasions if he had a license to carry a weapon and Cruz-Rivera did not answer.

In turn, defendant Cruz-Rivera testified that when he was stopped, four or five individuals came from behind a truck and approached his vehicle with weapons.  They, along with PRPOs Guzmán and Carrer, searched inside the vehicle for about twenty five minutes and did not find anything.

Thus, the testimony of defendant Cruz-Rivera is in direct contradiction to the testimonies of PRPOs Guzmán and Carrer who testified as to the gun which they indicated was found between the console and the front passenger seat.  After observing the demeanor of the PRPOs and defendant on the stand, after considering their testimonies as a whole and after having conducted the visual inspection of the Mazda 6 vehicle, we give no credibility to defendant's self-serving statement that the PRPOs did not observe or find anything in the vehicle when it was stopped.  Moreover, no credible evidence was presented by the defense to sustain its allegation the PRPOs lied about the probable cause requirement in order to administratively search the vehicle at the Vega Baja Police Station by alleging there was a firearm at plain view inside the vehicle.

In view of the foregoing and after carefully assessing the credibility of the witnesses, we conclude PRPOs Guzmán and Carrer observed defendant possessing a firearm he was not authorized to carry.  The observations were made immediately after defendant Cruz-Rivera got

United States of America v. Eduardo Cruz-Rivera
Criminal No. 06-027 (JAG)
Report and Recommendation
Page 28

out of his Mazda 6 vehicle.  Thus, once the firearm was detected by the PRPOs, there was

probable cause for defendant Cruz-Rivera's arrest.

## IV.    Seizure of Firearm when Vehicle was Stopped was Lawful.

Defendant Cruz-Rivera claims the weapon which was seized at the time the Mazda 6

vehicle was stopped was unconstitutional because the PRPOs did not have probable cause to

enter defendant's car and seize the evidence.

In the case at bar, the Mazda 6 vehicle was lawfully stopped as previously mentioned

and there was no search of the vehicle.  Pursuant to the testimonies of PRPOs Guzmán and

Carrer, a firearm was seen once defendant Cruz-Rivera exited his vehicle after being informed

of the traffic violations.  When asked whether defendant had a license to carry the firearm he

did not answer.  Thus, the firearm was seen at plain view and without the PRPOs conducting

a search of the Mazda 6 vehicle.

In any event, even if a search would have been done of the Mazda 6 vehicle in this case

by the PRPOs, the search would have conformed to legal standards under the "automobile

exception" to search warrants and was necessary to prevent the loss of evidence, especially

when, as in this case, the officers initially observed defendant in possession of a firearm he was

not authorized to carry.

In Michigan v. Long, 463 U.S. 1032, 103 S.Ct. 3469 (1983), the police had reasonable

suspicion to believe the occupants of a vehicle were dealing drugs, based on their observation

of an apparent transaction with another person minutes before. The Supreme Court held that

United States of America v. Eduardo Cruz-Rivera
Criminal No. 06-027 (JAG)
Report and Recommendation
Page 29

the police could stop the vehicle, order the occupants out and conduct a search of the passenger

compartment for weapons, including a locked glove compartment. Pursuant to Michigan v.

Long, a protective frisk of the passenger compartment is valid even when the passengers have

been removed from the car before the frisk takes place. *See* Maryland v. Wilson, 519 U.S. 408,

117 S.Ct. 882 (1997).

In this regards, it is to be noted that "the mobility of automobiles and the attendant need

to prevent loss of evidence undergirds" an exception to the warrant requirement. United States

v. López, 380 F.3d 538, 543 (1st Cir.2004). "A warrantless search of an automobile will be

upheld if officers have probable cause to believe that the vehicle contains contraband." Id.,

citing United States v. Ross, 456 U.S. 798, 808, 102 S.Ct. 2157 (1982).

In addition, the search would have been lawfully under New York v. Belton, 453 U.S.

454, 457, 460, 101 S.Ct. 2860, 2862, 2864 (1981). Under Belton, when a police officer makes

a lawful custodial arrest of the occupant of an automobile, the officer may, "as a

contemporaneous incident of that arrest," search the car's passenger compartment and any

containers found within it. *Id.* at 460-61 & n. 4. The "passenger compartment" has been

interpreted to mean those areas reachable without exiting the vehicle and without dismantling

door panels or other parts of the car. *See* Wayne R. LaFave & Jerold H. Israel, Criminal

Procedure § 3.7 at 277 (1984). The Belton doctrine has thus been extended to allow

warrantless searches of the rear section of a station wagon and the trunk area of a hatchback,

when these areas are accessible from inside the vehicle, as in this case. United States v. Pino,

855 F.2d 357, 364 (6th Cir. 1988) (station wagon); United States v. Russell, 670 F.2d 323, 327

(D.C.Cir. 1982) (hatchback).

In view of the foregoing, defendant Cruz-Rivera's argument the weapon which was

seized at the time the Mazda 6 vehicle was stopped was unconstitutional because the PRPOs

did not have probable cause to enter defendant's car and seize the evidence is without merit.

**V.     Inventory Search of the Mazda 6 Was Lawful.**

Defendant Cruz-Rivera further avers the search of his Mazda 6 vehicle at the Drugs

Division was outside the parameters of an administrative search making it unreasonable.

Defendant claims there is no standard procedure at the PRPD to conduct inventory searches.

In turn, the government claims in its Opposition that following an arrest, the vehicle and

all its contents and containers are lawfully subject to search.  Carroll v. United States, 267 U.S.

132, 45 S.Ct. 280 (1925).  That is, if "probable cause justifies the search of a lawfully stopped

vehicle, it justifies the search of every part of the vehicle and its content that may conceal the

object of the search."  Ross, 456 U.S. at 798.  Therefore, the search of the Mazda 6 vehicle was

lawful.

In addition, the government argued in its closing argument at the suppression hearing

the inevitable discovery exception applies to this case because the government would have

discovered the challenged evidence even had the alleged constitutional violation to which

defendant objects never occurred.

United States of America v. Eduardo Cruz-Rivera
Criminal No. 06-027 (JAG)
Report and Recommendation
Page 31

It is common practice for the police to conduct an inventory of the contents of vehicles they have taken into their custody or are about to impound." Wayne R. LaFave, *Search and Seizure* § 7.4 at 536 (3d ed. 1996 & Supp.2003). Such inventories "are now a well-defined exception to the warrant requirement of the Fourth Amendment." Colorado v. Bertine, 479 U.S. 367, 371, 107 S.Ct. 738 (1987). They are not treated as investigative searches because they serve three administrative purposes: "the protection of the owner's property while it remains in police custody, the protection of the police against claims or disputes over lost or stolen property, and the protection of the police from potential danger." South Dakota v. Opperman, 428 U.S. 364, 369, 96 S.Ct. 3092 (1976); United States v. Tueller, 349 F.3d 1239, 1243 (10th Cir. 2003 ); United States v. Haro-Salcedo, 107 F.3d 769, 772 (10th Cir. 1997).

An inventory search of an automobile is permitted where the police have lawfully impounded the automobile and the police have acted in accordance with reasonable, standard policy of routinely securing and inventorying contents of the impounded vehicle.  To be permissible under the Fourth Amendment, warrantless inventory searches must be conducted according to standardized procedures. Opperman, 428 U.S. at 372-75; Bertine, 479 U.S. at 374 n. 6; Florida v. Wells, 495 U.S. 1, 4-5, 110 S.Ct. 1632, 1635-36 (1990). Any "discretion [must be] exercised according to standard criteria and on the basis of something other than suspicion of criminal activity." Bertine, 479 U.S. at 375; United States v. Infante-Ruiz, 13 F.3d 498, 503 (1st Cir. 1994).

Generally, 'reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment.' " United States v. Richardson, 121 F.3d 1051, 1055 (7th Cir. 1997) (quoting Bertine, 479 U.S. at 374); United States v. Lumpkin, 159 F.3d 983 (6th Cir. 1998).

The Government in this case attempts to justify the validity of the search as an inventory search. The First Circuit has decided that such claim requires definite proof that the evidence would have been admitted regardless of any overreaching. Infante-Ruiz, 13 F.3d at 503-04. The Government bears the burden of showing by reference to the facts that the items would have been inevitably discovered. In addition, to be permissible under the Fourth Amendment, warrantless inventory searches must be conducted according to standardized objective procedures. Infante-Ruiz, 13 F.3d at 503. Any discretion must be exercised according to standard objective criteria and on the basis of something other than suspicion.

Nonetheless, courts have regularly approved inventory searches of impounded motor vehicles despite the absence of probable cause, see, e.g., Bertine, 479 U.S. at 371; United States v. Ramos-Morales, 981 F.2d 625, 626 (1st Cir. 1992) (collecting cases); United States v. Rodríguez-Morales, 929 F.2d 780, 785 (1st Cir. 1991); United States v. Trullo, 790 F.2d 205, 206 (1st Cir. 1986), and, by like token, courts often have held that evidence which would have turned up during an inventory search comes under the umbrella of the inevitable discovery rule, see, e.g., United States v. Seals, 987 F.2d 1102, 1107-08 (5th Cir. 1993); United States v. Horn, 970 F.2d 728, 732 (10th Cir. 1992); United States v. Williams, 936 F.2d 1243, 1248-49 (11th

Cir. 1991); <u>United States v. Mancera-Londono</u>, 912 F.2d 373, 375-76 (9th Cir. 1990); <u>United States v. Arango</u>, 879 F.2d 1501, 1507 n. 2 (7th Cir. 1989); *see also* <u>United States v. George</u>, 971 F.2d 1113, 1121 (4th Cir. 1992) (agreeing in theory); <u>United States v. Jenkins</u>, 876 F.2d 1085, 1088 (2d Cir.1989) (same); <u>United States v. Zapata</u>, 18 F.3d 971, 978-979 (1st Cir. 1994).

The Government in this case met its burden by introducing evidence by the testimonies of PRPOs Carrer and Ruiz that their actions were controlled by established procedures and standardized criteria of the PRPD as required by Supreme Court case law. *See* <u>Florida v. Wells</u>, 495 U.S. at 4-5; <u>Bertine</u>, 479 U.S. at 374 n. 6; <u>Opperman</u>, 428 U.S. at 372-75; <u>Infante-Ruiz</u>, 13 F.3d at 503.

In the instant case, PRPO Carrer conducted the inspection of the vehicle along with PRPO Ruiz and they used a PPR-128 form which is used by the PRPD to conduct an inventory of an impounded vehicle. An inventory search is done answering the questions on the PPR-128. PRPO Carrer testified the PPR-128 was prepared because, since a weapon was seized from the vehicle, the vehicle was seized for investigation and an inventory had to be done so the owner of the vehicle can see the content of the vehicle and if he/she agrees, the owner signs the PPR-128. In this case, the inventory search was performed in the presence of defendant Cruz-Rivera, as the owner of the vehicle. Defendant Cruz-Rivera  did sign the PPR-128. (Exhibit 4).

Pursuant to the testimonies of PRPOs Carrer and Ruiz, while they were finishing the inventory of the vehicle, they were able to observe that in the seat in the back part there was something which was not normal. There were some door hinges and the back seat was hard and rigid. The back seat would not move up or down; it was stuck there. PRPO Carrer and Ruiz took training at the PRPD and at the DEA regarding hidden compartments. When they became aware of the hidden compartment, the looked for a way to open the same. When one looks under the back seat, it is altered to create space. The carpet looked fine. A long weapon, an AK-47 with loaded magazines, was found underneath the seat in the compartment.

PRPO Carrer also testified the PPR-128 is the form used to conduct an inventory search of a vehicle. The PPR-128 says everything. The PRPO verifies whether the vehicle has the accessories which the PPR-128 indicates and if the body is in good condition. The trunk is normally opened and verified. The whole vehicle is verified, the carpets are pulled and everything is checked. The officers look underneath and behind the seats and that is how the compartment in this case was found. Within PRPO Carrer's experience of eight years with the PRPD he was found about three compartments but only the one in this case in the back seat. After the compartment was found, an inventory was made of all the contents of the compartment. PRPO Carrer testified that while conducting the inventory search the trunk is opened; the glove compartment is also opened and the carpets are pulled. Everything in the vehicle is verified. They look underneath the seats, including looking behind the back seat.

United States of America v. Eduardo Cruz-Rivera
Criminal No. 06-027 (JAG)
Report and Recommendation
Page 35

PRPO Carrer stated the inventory search in this case was done in the typical way inventory searches are done by the PRPD.

PRPO Ruiz testified it is generally the policy of the PRPD to verify these types of compartments. These types of compartments are normally opened. PRPO Ruiz indicated the use of the electronic machine is not standard operating procedure in performing an inventory search. Nonetheless, in the prior fifty inventory searches performed by PRPO Ruiz, he has used this machine when he has needed it. An inventory search is done answering the questions on the PPR-128. PRPO Ruiz took out the molding, identified the cables he was going to use, opened the hood and connected them to the battery. On this occasion, this was the usual police procedure during the PPR-128.

Although there was no testimony by the PRPOs that there is a standard written policy on inventory searches conducted by the PRPD, based on the testimonies of PRPOs Carrer and Ruiz, there is a procedure which is normally followed in which after the driver is arrested and taken to the station, the car is impounded and an inventory search is conducted of the vehicle's content prior to storage in the presence of the owner. The standard form used to perform the inventory search at the PRPD is the PPR-128. The inventory search is performed by using the PPR-128 as it was done in this case. The list (PPR-128) is signed by the owner and the officer, as it was done in this case. Thus, an oral policy or established routine existed at the PRPD. Thus, there is a standard policy at the PRPD of routinely securing and inventorying contents of

United States of America v. Eduardo Cruz-Rivera
Criminal No. 06-027 (JAG)
Report and Recommendation
Page 36

the impounded vehicle.  Accordingly, the government has met its burden of showing the items

in question would have been inevitably discovered.

Furthermore, we note that no credible evidence was introduced by defendant to show

the PRPOs acted in bad faith for the sole purpose of investigation in conducting the inventory

search of his vehicle.   Bertine, 479 U.S. at 367.[8]

Finally, the seizure in this case can be saved on probable cause grounds as previously

explained.  *See* Infante-Ruiz, 13 F.3d at 502.  When defendant Cruz-Rivera was originally

stopped by the PRPOs, a firearm was seen and seized from inside the vehicle. In this regards,

it is to be noted that "the mobility of automobiles and the attendant need to prevent loss of

evidence undergirds" an exception to the warrant requirement.  López, 380 F.3d at 543. "A

warrantless search of an automobile will be upheld if officers have probable cause to believe

that the vehicle contains contraband." Id., citing Ross, 456 U.S. at 808.

In view of the foregoing, the inventory search of the Mazda 6 vehicle following the PPR-

128 was lawful.[9]

_____

[8]Regarding evidence obtained from defendant's backpack during an inventory search, the Supreme Court,
Chief Justice Rehnquist, held that in the absence of showing that police, who followed standardized caretaking
procedures, acted in bad faith for the sole purpose of investigation in conducting inventory search of defendant's
van, evidence discovered during search was admissible. Bertine, 479 U.S. at 367.

[9] Defense counsel tried to impeach the PRPOs because some parts of the PPR-128 were not filled out.
See Exhibit 4.  A review of PPR-128 used in this case shows that several spaces on the form were not filled out
(i.e. lot no., removal date, time, tag, among a few others).  Nonetheless, a review of the whole PPR-128
demonstrates it was filled out almost in its entirety including the most important parts to fulfill its main purpose of
performing an inventory of the seized vehicle, to wit, "Equipment and Accessories." Also, the PPR-128 was signed
by PRPO Carrer and defendant Cruz-Rivera and it was dated.  In addition, we note the spaces which were left in
blank were not purposely omitted.  PRPO Carrer testified it was a mistake the information as to why the vehicle
was seized was not completed.  Moreover, Exhibit 4 was admitted without objection from defense counsel after
it was established that it was signed by PRPO Carrer. (Suppression Hearing Transcript, 6/21/06, p. 12).  Thus, the

United States of America v. Eduardo Cruz-Rivera
Criminal No. 06-027 (JAG)
Report and Recommendation
Page 37

## VI.   Probable Cause to Open Hidden Compartment.

The government submits there was probable cause to search the hidden compartment under <u>Ross</u>, 456 U.S. at 798 and <u>Belton</u>, 453 U.S. at 457.  We agree as previously explained under probable cause grounds to search the vehicle.  The vehicle in this case was lawfully stopped as previously mentioned.  Under the rationale of <u>Ross</u> and of <u>Belton</u>, after the legal stop, the PRPOs were justified in searching the vehicle and hidden compartment.

Under the automobile exception to the warrant requirement, law enforcement officers may search a readily mobile vehicle without a warrant if they have probable cause to believe that the vehicle contains evidence of a crime. <u>Ross</u>, 456 U.S. at 799; <u>Smith v. Thornburg</u>, 136 F.3d 1070, 1074 (6th Cir. 1998) (citing <u>California v. Carney</u>, 471 U.S. 386, 390-94, 105 S.Ct. 2066 (1985)). "Probable cause exists when there is a 'fair probability that contraband or evidence of a crime will be found in a particular place.' " <u>Smith</u>, 136 F.3d at 1074 (quoting <u>United States v. Wright</u>, 16 F.3d 1429, 1437 (6th Cir. 1994)).

Furthermore "[t]he Court has recognized that the physical characteristics of an automobile and its use result in a lessened expectation of privacy therein[.]". *See* <u>New York v. Class</u>, 475 U.S. 106, 112, 106 S.Ct. 960 (1986); *see also* <u>Illinois v. Lidster</u>, 540 U.S. 419, 124 S.Ct. 885 (2004) (The Fourth Amendment does not treat a motorist's car as his castle). Although the Supreme Court has acknowledged that the stop and search of a vehicle does present a conflict between "the individual's constitutionally protected interest in privacy and the

---

fact that some parts of the PPR-128 were left is inconsequential and would not have changed our recommendation in this case.

United States of America v. Eduardo Cruz-Rivera
Criminal No. 06-027 (JAG)
Report and Recommendation
Page 38

public interest in effective law enforcement," <u>Ross</u>, 456 U.S. at 804, 102 S.Ct. 2157, the Court has also made clear that "[t]hese interests must yield to the authority of a search" justified by probable cause. *Id.* at 823, 102 S.Ct. 2157. The fact that the contraband was in a container in a locked, hidden compartment does not justify any extra measure of consideration. The Supreme Court has explicitly stated that "[t]he police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained." <u>California v. Acevedo</u>, 500 U.S. 565, 580, 111 S.Ct. 1982 (1991); *see also* <u>United States v. Owens</u>, 167 F.3d 739, 750 (1st Cir. 1999) ("[I]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.") (quoting <u>Ross</u>, 456 U.S. at 800, 102 S.Ct. 2157). Similarly, "efforts to restrict access to an area do not generate a reasonable expectation of privacy where none would otherwise exist," <u>Class</u>, 475 U.S. at 114, 106 S.Ct. 960; <u>López,</u> 380 F.3d at 544-545.

In view of the foregoing, we conclude that, under the totality of the circumstances of this case, the PRPOs had probable cause to search the hidden compartment at the back seat of defendant's vehicle.

Finally, we address defendant Cruz-Rivera's challenge to the way the hidden compartment in this case was opened by the use of an electronic mechanism. PRPO Ruiz testified it is generally the policy of the PRPD to verify these types of compartments. To open these types of compartments happens on normal occasions. Even though, PRPO Ruiz indicated

the use of this electronic machine is not standard operating procedure in performing an

inventory search, he stated that in the prior fifty (50) inventory searches performed by PRPO

Ruiz, he has used this machine when he has needed it. PRPO Ruiz took out the molding,

identified the cables he was going to use, opened the hood and connected them to the battery.

On this occasion, this was the usual police procedure during the PPR-128.

Moreover, we note PRPO Ruiz attended trainings sponsored by the DEA and the PRPD

on how to open these types of hidden compartments.

Thus, based on the testimony of PRPO Ruiz, the procedure used in this case was the

ordinary procedure to be followed at the PRPD to open a compartment similar to the one in

this case. Hence, to open the hidden compartment as part of the inventory search was proper.[10]

## CONCLUSION

Based on the witnesses' testimony at the suppression hearing, including the testimonies

of the PRPOs and of defendant Cruz-Rivera, and having assessed their credibility and taking

into account the documentary evidence also presented and the visual inspection conducted by

the undersigned, it is determined that, pursuant to the preponderance of the evidence and

considering the totality of the circumstances, there was reasonable suspicion for the initial stop

of the Mazda 6 vehicle, there was probable cause for the subsequent inventory search of the

---

[10]The fact that an officer suspects that contraband may be found does not defeat an otherwise proper
inventory search. See United States v. Harvey, 16 F.3d 109, 112 (6th Cir. 1994); United States v. Lewis, 3 F.3d
252, 254 (8th Cir.1993) (noting that "[t]he presence of an investigative motive ... does not invalidate an otherwise
valid inventory search"). Therefore, the fact that the PRPOs may have suspected that the compartment contained
evidence of wrongdoing does not render their inventory search invalid if otherwise found to be lawful.

United States of America v. Eduardo Cruz-Rivera
Criminal No. 06-027 (JAG)
Report and Recommendation
Page 40

Mazda 6 vehicle, the hidden compartment and the arrest of defendant Cruz-Rivera, and thus

consonant with its admissibility under the above findings and applicable law.

Accordingly, it is recommended that the Motion to Suppress (**Docket No. 23**) be

DENIED.

IT IS SO RECOMMENDED.

The parties have ten (10) days to file any objections to this report and recommendation.

Failure to file same within the specified time waives the right to appeal this order.  Henley

Drilling Co. v. McGee, 36 F.3d 143, 150-151 (1st Cir. 1994); United States v. Valencia, 792

F.2d 4 (1st Cir. 1986).  *See* Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d

985, 991 (1st Cir. 1988) ("Systemic efficiencies would be frustrated and the magistrate's role

reduced to that a mere dress rehearser if a party were allowed to feint and weave at the initial

hearing, and save its knockout punch for the second round").

In San Juan, Puerto Rico, this 13th day of September of 2006.


                    s/CAMILLE L. VELEZ-RIVE
                    CAMILLE L. VELEZ-RIVE
                    UNITED STATES MAGISTRATE JUDGE